J-E03003-21

2022 PA Super 95

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SYLVESTER ANDERSON | : | No. 662 MDA 2020 |

Appeal from the Suppression Order Entered April 21, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0004013-2019

BEFORE:  PANELLA, P.J., BENDER, P.J.E., BOWES, J., OLSON, J., STABILE, J., KUNSELMAN, J., NICHOLS, J., KING, J., and McCAFFERY, J.

OPINION BY McCAFFERY, J.:                    **FILED: MAY 25, 2022**

The Commonwealth appeals from the April 21, 2020, order entered in the Court of Common Pleas of Dauphin County granting the motion to suppress filed by Sylvester Anderson (Appellee).[1] The Commonwealth contends the trial court erred in categorizing the police interaction with Appellee as an improper investigative detention rather than a mere encounter. Central to this appeal is the question of whether a reasonable person would feel free to leave or not engage with a police officer when, *inter alia*, this was a two-phase interaction, there were multiple armed and uniformed officers

---

[1] The Commonwealth took this interlocutory appeal pursuant to its certification under Pa.R.A.P. 311(d) that the trial court's ruling terminates or substantially handicaps it prosecution.  **See** Commonwealth's Brief at 1; **see also Commonwealth v. Holston**, 211 A.3d 1264, 1268 (Pa. Super. 2019) (*en banc*).

present, and one officer requested Appellee's identification while also questioning him about his parole status and whether he had anything on his person. The Commonwealth suggests yes. Moreover, the Commonwealth argues the trial court erred in finding that the officer's search of Appellee's person exceeded the scope of consent that he granted and therefore, the Commonwealth was unable to meet its burden of proving valid consent. Upon review, we affirm.

The trial court summarized the relevant facts of this case, which were taken from the January 2020 suppression hearing, as follows:

> On May 29, 2019, Officer Chad McGowan (hereinafter "Officer McGowan") of the City of Harrisburg Police department was assigned to the Street Crimes Unit. He was accompanied by four (4) other law enforcement officers – Adult Probation Officer Chianos, Sheriff Deputy Long, Sheriff Deputy [Maurice] Edwards, and Corporal Teeter,[2] all of whom were in an unmarked police car equipped with police lights as part of their patrol for the Street Crimes Unit. All were dressed in the Street Crimes Unit outfit – tactical attire, sewn-on badge in the front, police insignia on the front and back, and "Street Crimes Unit" on one sleeve, and either "Police" or "Sheriff" or "Probation" (depending on the officer's employment) on the other sleeve.
>
> At approximately 9:30 P.M., Officer McGowan was driving an unmarked vehicle with four (4) other uniformed and armed law enforcement officers through the parking lot of Harrisburg Fried Chicken, located at 1314 Market Street. This parking lot is known to officers as a high crime, high drug area.
>
> Officer McGowan observed an unknown male (later identified as [Appellee]) "on his hands and knees, looked to be

---

2 A review of the certified record does not reveal the first names of Officer Chianos, Sheriff Deputy Long, and Corporal Teeter.

crawling on the ground, next to a red Dodge pickup truck" for less than a minute. The vehicle was not running, Officer McGowan did not see anyone operating the truck and did not observe how the truck got into the parking lot. Further, there was no indication that [Appellee] was the operator of the truck except for [his] proximity to the truck. Officer McGowan pulled his vehicle, with a total of five (5) uniformed and armed law enforcement officers, beside [Appellee] and saw that he was "profusely sweating[2]," and asked if [Appellee] was okay. [Appellee] responded that he had just dropped something on the ground. Officer McGowan testified that he considered that to be the end of their initial contact.

_____

[2] The unconverted testimony is that on May 29, 2019, the high temperature was 86 degrees with 67% humidity.

_____

[Appellee] then entered Harrisburg Fried Chicken. After [he] went inside, Officer McGowan testified that he noticed the driver's side window of the truck was down, which he believed was uncommon for this area. In addition, the car was not parked within the lines of the parking space. Officer McGowan "became curious if the individual was possibly, you know, intoxicated or impaired on alcohol or a controlled substance." Despite these observations, Officer McGowan testified that he did not intend to find the driver of the vehicle or ask [Appellee] if he was the operator of the vehicle. Rather, he, along with four (4) other armed and uniformed law enforcement officers, waited in the vehicle which was parked in the drive-through. However, Deputy Sheriff Edwards testified that all five (5) armed and uniformed law enforcement officers exited the vehicle once [Appellee] went inside Harrisburg Fried Chicken. Deputy Sheriff Long walked over to the entrance and watched [Appellee] the entire time he was inside [the food establishment], and noted that [Appellee] did not order food [but did get a soda,] and was pacing inside.

Officer McGowan testified that when [Appellee] exited Harrisburg Fried Chicken, he looked left toward the officers, and then turned right and began walking in the opposite direction. Based on that behavior, Officer McGowan, along with Deputy Sheriff Edwards approached [Appellee] – dressed in their Street Crimes Unit outfit and armed.[3] Officer McGowan asked to speak to [Appellee], which he obliged. Officer McGowan then asked [Appellee] for identification, which [Appellee] provided a valid

identification.[4] He then specifically asked [Appellee] if he was on parole and if there was anything illegal on his person. [Appellee] responded that he was on parole but did not have anything illegal on his person. Notably, Officer McGowan did not document that [Appellee] was "profusely sweating" nor exhibiting signs of being under the influence during this second encounter. Interestingly, Deputy Sheriff Edwards testified that he smelled an odor of alcohol and [Appellee]'s eyes were red and glassy.

_____

[3] Officer McGowan is 6'6" and 240 pounds, Deputy Sheriff Edwards is 5'9", and [Appellee] is 5'6".

[4] Neither Officer McGowan nor Deputy Sheriff Edwards could recall whether a warrant check was conducted when [Appellee] provided his identification.

_____

Apparently not satisfied with [Appellee]'s answers, Officer McGowan asked [Appellee] for permission to search his person. Officer McGowan testified that he did not believe [Appellee] was untruthful in his responses, [Appellee] was calm, and did not show any signs of intoxication (i.e. no odor of alcohol) – the "best glimpse" Officer McGowan had that something was "off" was the fact that [Appellee] was allegedly sweating profusely when he first stood up from being on the ground. Further, Deputy Sheriff Edwards stated that he believed at that point they had "some reasonable suspicion of something," but were still treating it as a mere encounter. Notably, Officer McGowan did not testify that he wanted to pat-down [Appellee] for officer safety. Rather, he specifically asked [Appellee] to search his person. According to the testimony, [Appellee] granted verbal consent and "held his hands up in the air as if allowing me [Officer McGowan] to conduct my search a little easier."

Officer McGowan first searched [Appellee]'s pockets and found nothing of significance. He then "swept over [Appellee]'s groin region" and "felt a hard and distinct bulge . . . it was immediately apparent to me he had a substantial amount of crack cocaine down the front of his pants." Further, Officer McGowan testified that "[b]efore it was even recovered, I remember specifically saying to my partner, he has an ounce of crack down his pants. And sure enough, we removed 28.3 grams of crack

cocaine." At that point, Officer McGowan decided to place [Appellee] under arrest.

[Appellee] attempted to flee but was tackled a few feet away and a struggle ensued. Officer McGowan stated that [Appellee] was resisting arrest until Deputy Sheriff Edwards "advised him that he was going to Taser him if he did not comply." After [Appellee] was handcuffed, Officer McGowan recovered the "large amount of crack cocaine." It was later determined that the substance recovered "was almost exactly an ounce of crack cocaine, just like [Officer McGowan] thought."

[Appellee] testified on his own behalf at the suppression hearing. His testimony was generally the same as that of Officer McGowan and Deputy Sheriff Edwards. However, [Appellee] testified that during the initial encounter, Officer McGowan exited his vehicle, asked him what he was doing, and asked for his identification. Additionally, [Appellee] stated that Officer McGowan patted him down before going into Harrisburg Fried Chicken. During the second encounter with [Appellee], Officer McGowan "went in my pockets, pulled the stuff out of my pockets, and then he patted me down, which he admitted. He didn't just swipe. And then he starts rubbing – grabbing my testicles and penis." [Appellee] stated that the search made him feel sexually violated. [Appellee] also disputes that he ran – "I didn't have a chance to run from him. I wouldn't have ran because they had a K-9 . . . dog[] out there."[5]

_____

[5] Although Deputy Sheriff Long is a K-9 handler, according to Officer McGowan, he did not have his K-9 partner with him that night of the incident. However, Officer McGowan stated that Sergeant Meik, who is also a K-9 handler, arrived on scene toward the end of the interaction.

Trial Ct. Op., 6/30/20, at 1-5 (record citations and emphasis omitted). At the conclusion of the encounter, the police arrested and charged Appellee with numerous offenses.[3]

On August 1, 2019, a preliminary hearing was conducted, where Officer McGowan testified about the events that transpired on the evening of May 29th. The matter was then held over for court.

On November 12, 2019, Appellee filed a motion seeking suppression of all physical evidence and incriminating statements which he alleged were "unlawfully and unconstitutionally obtained from him under the state and federal constitutions." Defendant's Motion to Suppress Evidence, 11/12/19, at 23. Specifically, Appellee stated that his constitutional rights were violated because the police lacked both reasonable suspicion and probable cause when they first stopped him in the parking lot where he was not engaged in any illegal or suspicious activity and was not in a high-crime area, and then when upon entering and subsequently exiting a restaurant, the officers followed, questioned, and searched him without his consent. *See id.* at 6. Appellee alleged that although Officer McGowan testified that his initial interaction with Appellee was a "mere encounter," it transformed into an "investigative detention" once the officers detained him, ordered him to put down what he

_____

[3] *See* 35 P.S. §§ 780-113(a)(30) and (a)(32), and 18 Pa.C.S. §§ 5104 and 5505.

was holding, and "coerced a bodily search of his person." ***Id.*** at 12. Appellee averred the officer lacked reasonable suspicion to support the stop based on the following: (1) Appellee did not commit any illegal acts in the parking lot; (2) the officer testified that he did not detect any odor of alcohol on Appellee's breath; (3) the officers did not observe Appellant engaged in any other suspicious activity; and (4) there was no apparent indication that Appellee possessed a gun, other weapon, or contraband on his person. ***See id.*** at 13.

Moreover, Appellee claimed that his consent to the officer's search of his person was not voluntarily, knowingly, or intelligently made. ***See*** Defendant's Motion to Suppress Evidence, 11/12/19, at 17. He stated that he was "cornered by multiple officers in a dark parking lot at night" and the officers "demanded to know whether he was on probation [or] parole" and questioned whether he had anything illegal on his person. ***Id.*** at 20. In support of his argument, Appellee alleged he was never told he was free to leave, the officer directed his movements, the line of questioning was intimidating and coercive, the officer's demeanor was also coercive, and the officer never informed Appellee that he could refuse to the consent of his person. ***See id.*** Lastly, Appellee alleged that his attempt to flee the scene could not serve as a basis for reasonable suspicion. ***See id.*** at 21.

The court held a suppression hearing on January 23, 2020.[4] The court subsequently granted Appellee's motion on April 21, 2020, ordering that "all evidence following the improper search of [Appellee]'s person shall be suppressed." Order, 4/21/20 (some capitalization and emphasis omitted). In the corresponding opinion, the court focused its analysis solely on the consent issue, first opining: "We find Officer McGowan's testimony to be credible, and find that consent was freely given, and that Officer McGowan immediately recognized the object found in [Appellee]'s pants as contraband." Trial Ct. Op., 4/21/20, at 3. However, the court then turned to the issue of whether

---

[4] The Commonwealth did not file a response to Appellee's motion to suppress, but following the hearing, it did file a proposed findings of fact and conclusions of law regarding the motion to suppress. *See* Commonwealth's Proposed Findings of Fact and Conclusions of Law Regarding the Defendant's Motion to Suppress Evidence, 2/5/20. The Commonwealth alleged Officer McGowan took no coercive action to obtain Appellee's consent to search. *See id.* at ¶ 23. It also averred that "[b]y failing to raise the question of scope of consent with specificity," Appellee waived the issue; but even if he had properly preserved the argument, the search was within the scope of Appellee's unrestricted consent to the officer's request. *Id.* at ¶ 54-55. The Commonwealth further asserted that Officer McGowan's interaction with Appellee constituted a mere encounter where the officer requested identification and asked questions, "but neither he nor his partners conveyed an implicit or explicit message that compliance with his requests was required." *Id.* at ¶ 61 (citation omitted). The Commonwealth provided the alternative argument that even if the interaction amounted to an investigative detention, the officer possessed reasonable suspicion based on the totality of the circumstances. *See id.* at ¶ 62.

Appellee also submitted his own proposed findings of fact and conclusions of law regarding the motion to suppress. *See* Defendant's Proposed Findings of Fact and Conclusions of Law re: Suppression Motion, 2/14/20.

the officer exceeded the consent Appellee granted him. ***See id.*** The court

determined:

> The Commonwealth also argue[d] that [Appellee] did not "restrict the scope of his consent to a search of his person for contraband." However, there was nothing in the verbal exchange between the officer and [Appellee] as to what the officer was looking for, or where the officer intended to search. Without the officer stating how thorough a search was intended, or what the search was for, there would be no reason to state that his consent did not extend to his genitals. If anything, a reasonable person would most likely expect a ***Terry***[5] pat-down weapons search, as routinely seen in movies and television. This [c]ourt would conclude that even a Transportation Security Administration ("TSA") search would not include the genital area without specific consent or moving the search to a non-public location.
>
> Although this [c]ourt is impressed with Officer McGowan's police instincts, we are constrained to conclude that the search of [Appellee]'s person exceeded the scope of consent that [Appellee] granted. Officer McGowan searched [Appellee]'s groin region in a public parking lot, and it was not reasonable for Officer McGowan to believe that [Appellee]'s consent extended to such an intrusive search of a private area. Accordingly, the Commonwealth was unable to meet its burden of proving valid consent to conduct such an invasive search of the intimate parts of his person.

***Id.*** at 5-6 (citation omitted). The Commonwealth timely filed a notice of

appeal.[6]

On March 30, 2021, a divided three-judge panel of this Court reversed

the trial court's order and remanded the matter for further proceedings in a

---

[5] ***Terry v. Ohio***, 392 U.S. 1 (1968).

[6] The court did not order the Commonwealth to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), but the court did file an opinion pursuant to Pa.R.A.P. 1925(a) on June 30, 2020.

non-precedential decision. Employing an objective test, the majority concluded that both stages of interaction between Officer McGowan and Appellee – meaning the time periods before and after Appellee went into the restaurant – were mere encounters. Referencing **Commonwealth v. Au**, 42 A.3d 1002 (Pa. 2012), as controlling case law, the majority pointed out that the trial court credited Officer McGowan's testimony and further construed that the officer's request for Appellee's identification did not transform the encounter into an investigative detention. The majority determined that Appellee's consent was not the product of an illegal detention because the totality of the circumstances did not reasonably convey to Appellee that he was obligated to talk to Officer McGowan or that he could not have gone about his business. The majority also addressed the alternative argument that even if the second encounter constituted an investigative detention, the police possessed reasonable suspicion where: (1) Appellee was observed crawling on the ground next to the truck that was not properly parked; (2) he was sweating profusely; and (3) as Appellee left the restaurant, he started walking towards the officers but, when he saw that they were still there, he turned and walked in the opposite direction.

The majority then addressed the scope of consent issue,[7] finding the Commonwealth's argument that Officer McGowan did not exceed the scope of Appellee's consent persuasive. The majority determined a reasonable person in Appellee's shoes would have understood from the context of the entire exchange with Officer McGowan that the search included the groin area. It also stated that a preceding question — about whether Appellee had anything illegal on his person — was the obvious trigger for the request to search.

The dissent, on the other hand, agreed with the trial court that scope of the search of Appellee's person exceeded the consent given based on the area searched. Moreover, the dissent concurred with the court that when Appellee was approached by five uniformed officers who asked for, and then retained, his identification card, such evidence supported the conclusion that the encounter escalated from a mere encounter to an investigative detention. The dissent pointed to the following: (1) none of the investigating officers took steps to discover whether Appellee was the operator of the crookedly parked vehicle; (2) sweating in late May is not evidence of driving or being under the influence; and (3) the fact that Appellee walked away from the officers demonstrated that he was not driving.

---

[7] The Commonwealth argued that Appellee had not properly preserved the claim, but the majority determined Appellee had raised the argument at the suppression hearing, thereby preserving the challenge.

Thereafter, Appellee filed an application for reargument *en banc*, arguing, *inter alia*, that the majority erred in concluding that the police were not performing an investigative detention when they procured consent to search Appellant's person, and that it failed to cite controlling precedent from the Pennsylvania Supreme Court in **Commonwealth v. Cost**, 224 A.3d 641 (Pa. 2020). This Court granted Appellee's request and withdrew the three-judge panel decision issued in this matter. *En banc* argument was held in December 2021, and the case is now before us.

The Commonwealth raises the following issues on appeal:

1. Whether the [trial] court erred in granting Appellee's suppression motion where the encounter between the Appellee and the police officer was a mere encounter and not an investigatory detention?

2. Whether, in the alternative, the [trial] court erred in granting the Appellee's suppression motion where police possessed reasonable suspicion for an investigatory detention?

3. Whether the [trial] court erred in granting the Appellee's motion to suppress evidence where the Appellee voluntarily consented to the search and the search did not exceed the scope of that consent?

4. Whether Appellee waived his challenge to law enforcement's alleged exceeding the voluntariness of his consent by not raising it in the [trial] court?

Commonwealth's Brief at 4 (some capitalization omitted). Based on the nature of the Commonwealth's claims, we will address the first two arguments together, and then the remaining claims jointly.

When reviewing suppression decisions, our standard of review is limited.

We review trial court suppression orders to determine whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record. In reviewing an appeal by the Commonwealth of a suppression order, we may consider only the evidence from the [defendant's] witnesses along with the Commonwealth's evidence which remains uncontroverted. Our scope of review of suppression court factual findings is limited to the suppression hearing record. We, however, are not bound by a suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary.

***Commonwealth v. Barr***, 266 A.3d 25, 39 (Pa. 2021) (citations and quotations marks omitted).

The Commonwealth first argues that the trial court erred in granting Appellee's motion to suppress because the entire interaction between the police and Appellee constituted a mere encounter and did not rise to the level of an investigative detention. **See** Commonwealth's Brief at 11. Relying on **Au**, **supra**, the Commonwealth suggests that this Court "should find that the arresting officer's request for [Appellee]'s identification did not transform the encounter into an unconstitutional detention." Commonwealth's Brief at 14. The Commonwealth points to the following in support of its argument:

Here, given the late hour, the fact that [Appellee] was seen crawling on his hands and knees while sweating profusely in a parking lot that is known as a high-drug area, [Appellee]'s sudden departure into the store, the cockeyed parking of the truck, and the fact that [Appellee] walked away from his vehicle while the windows were still down in a high crime area, provided plenty of reasons for the officer to investigate further.

*Id.* Moreover, the Commonwealth states that Officer McGowan did not request Appellee's identification "until after he witnessed [Appellee]'s strange behavior only a few moments before" and "the officers did not block [Appellee]'s vehicle from leaving the parking lot nor did they block [him] from leaving the area." *Id.* at 15. The Commonwealth reiterates that the interaction was nothing more than a mere encounter and the officer's request for identification did not transform the matter into an unconstitutional investigatory detention. *See id.* at 16.

In its second claim, the Commonwealth addresses the alternative argument that even if the interaction was an investigatory detention, the police officers possessed the requisite reasonable suspicion and therefore, Appellee was legally detained. *See* Commonwealth's Brief at 16. Relying on ***Commonwealth v. Carter***, 105 A.3d 765 (Pa. Super. 2014) (*en banc*), the Commonwealth contends that Officer McGowan had reasonable suspicion to first seize Appellee and then conduct the pat-down where he observed Appellee "on his hands and knees, sweating profusely near a vehicle that was parked cockeyed, at night, in a high-drug area." *See* Commonwealth's Brief at 19. Moreover, the officer articulated that based on his experience and "observations of [Appellee's strange conduct, that [Appellee] could [have been] intoxicated." *Id.* at 20. The Commonwealth further states that the officer's actions were warranted based on the belief that "his safety was at risk." *Id.* Lastly, the Commonwealth argues for the first time that "Officer

McGowan was discharging his duties" under the public servant exception of the community caretaking doctrine.[8] *Id.* at 21. Specifically, the Commonwealth alleges "Officer McGowan was discharging his duties" under the exception "when he was checking on [Appellee], who appeared to be intoxicated in a high drug area, hunched over on the ground on all fours." *Id.* at 22.

When a defendant files a motion to suppress evidence, "it is the Commonwealth's burden to present evidence that the defendant's constitutional rights were not infringed." *Commonwealth v. Enimpah*, 106 A.3d 695, 701 (Pa. 2014).

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. Because interactions between law enforcement and the general citizenry are widely varied, search and seizure law looks at how the interaction is classified and if a detention has occurred.

---

[8] *See Commonwealth v. Livingstone*, 174 A.3d 609, 634 (Pa. 2017) (holding "in order for the public servant exception of the community caretaking doctrine to apply, police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance.") (citations omitted).

*Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super. 2019) (internal citations and quotation marks omitted).

In determining whether a police officer's interaction with a citizen was proper, we are guided by the following:

> Our Supreme Court has explained the three types of interactions between law enforcement and private citizens as follows:
>
> > The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way. The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid[,] police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.
> >
> > No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person.

*Commonwealth v. Adams*, 205 A.3d 1195, 1199-1200 (Pa. 2019) (citations, brackets and some quotation marks omitted).

Further, in considering whether a seizure occurred, or whether a reasonable person would feel free to leave, courts may examine the following:

[T]he number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Commonwealth v. Beasley*, 761 A.2d 621, 624-25 (Pa. Super. 2000) (citation omitted). Further, "[w]ith respect to the show of authority needed for a detention, the circumstances must present some level of coercion, beyond the officer's mere employment, that conveys a demand for compliance or threat of tangible consequences from refusal." *Luczki*, 212 A.3d at 544.

*Commonwealth v. Jones*, 266 A.3d 1090, 1094-95 (Pa. Super. 2021).

Here, no one disputes that the initial contact the officers had with Appellee, meaning when Officer McGowan spoke with him before he walked into the restaurant, was a mere encounter and did not require any level of suspicion. *See* Trial Ct. Op., 6/30/20, at 7; Commonwealth's Brief at 11-22; Appellee's Substituted Brief at 18-33.

The issue is the second phase of the encounter – after Appellee exited the restaurant and the officers immediately stopped him. The trial court found the "second contact with Appellee began as a mere encounter and escalated to an investigative detention requiring reasonable suspicion." Trial Ct. Op., 6/30/20, at 7. The court opined:

> Based on the totality of the circumstances, and taking into account all reasonable inferences in light of Officer McGowan's experience, we find that Officer McGowan lacked the requisite reasonable suspicion to subject Appellee to an investigation detention, as well as a pat-down search or *Terry* frisk, as he failed to provide specific and **articulable** facts that would lead him to believe [that] criminal activity was afoot.

*Id.* at 9 (emphasis in original).

We note that the trial court's factual findings are supported by the record, and therefore, we are bound by those findings. *See Barr*, 266 A.3d at 39. We now turn to the question of whether the stop at issue elevated the interaction beyond a mere encounter – in other words, the "free to leave test." We reiterate that the test examines whether based on circumstances surrounding the encounter, "the police would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person." *Adams*, 205 A.3d at 1200 (citations and quotation marks omitted).

Moreover, we are mindful that a defendant's location "in a high crime area" and his sweating, which implies nervousness, are factors that may be considered in determining whether a police officer possesses reasonable suspicion. *See Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*); *Commonwealth v. Cartagena*, 63 A.3d 294, 304 n.24 (Pa. Super. 2013). Nevertheless, under the totality of the circumstances test, "no single factor controls the ultimate conclusion as to whether a seizure

occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter." *Luczki*, 212 A.3d at 543 (citation omitted). We also emphasize that in order to establish reasonable suspicion, the officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation and quotation marks omitted).

A review of the record reveals the information present at the time Officer McGowan stopped Appellee, asked for his identification and questioned him was as follows. Four police officers were on patrol, all in an unmarked vehicle, and were in uniform and armed. *See* N.T., 1/23/20, at 5-6, 50. They first spotted Appellee in a parking lot of a restaurant, which was deemed a high crime/high drug area, at 9:30 p.m. *See id.* at 5-7. Officer McGowan[9] observed Appellee crawling on his hands and knees, for approximately one minute, by a parked, albeit askew, truck that was turned off. *See id.* at 7-8, 11, 30. The officer testified, "I just began watching him. I wasn't sure what was going on. I found it to be **a little unusual**." *Id.* at 8 (emphasis added). The officer then drove towards his location and rolled down his window while

---

[9] At the time of the hearing, Officer McGowan had been a police officer for over seven years and had special training in drug law enforcement. *See* N.T., 1/23/20, at 4.

- 19 -

Appellee turned around and looked at the car. *See id.* at 9. Officer McGowan noticed that Appellee was "sweating profusely." *Id.*[10] The officer asked Appellee "if he was okay, and he said that he had dropped something." *Id.* Appellee continued walking and went inside the restaurant.[11] *See id.* Officer McGowan again testified "it was **a little bit** of an **unusual** encounter/observation, the fact that he's on his hands and knees, and then the way I saw he was sweating. I **wasn't sure what was going on**." *Id.* at 10 (emphasis added).

Officer McGowan then looked at the truck, noting that the parking spots were on a diagonal, but the vehicle was parked straight, and the driver's window was "completely lowered." N.T., 1/23/20, at 11. The officer stated, "And as I started to think about everything, I **became curious** if the individual was possibly, you know, intoxicated or impaired on alcohol or a controlled substance." *Id.* (emphasis added).

After Appellee exited the restaurant, Officer McGowan said that he looked at the officers, and then turned to his right and began walking down the street. *See* N.T., 1/23/20, at 11-12. It was at this point that Officer

---

[10] The uncontroverted testimony established the temperature that day was 86 degrees. *See* N.T., 1/23/20, at 33.

[11] Deputy Edwards testified Appellee was in the restaurant for five minutes and walked out with a soda in his hand. *Id.* at 69.

McGowan, accompanied by Deputy Edwards,[12] decided to ask Appellee if they could speak to him. *See id.* at 12-13. Appellee complied. *See id.* at 12. Officer McGowan then asked for Appellee's identification, as well as if Appellee was on parole and whether he had anything illegal on his person. *See id.* at 13-14. Appellee provided identification, while responding that he was on parole and that he did not have anything on his person. *See id.* Officer McGowan then asked to search Appellee's person, to which Appellee agreed. *See id.* at 15. Appellee put his arms up at a 90-degree angle with his body, and then the officer checked his pockets. *See id.* at 15-17. Finding nothing in the pants pockets, Officer McGowan then "swept over [Appellee]'s groin region" and felt a hard, distinct bulge. *Id.* at 17-18.

On cross-examination, Officer McGowan was asked again about the first encounter, where he observed Appellee crawling on the ground. N.T., 1/23/20, at 31. The officer explained: "I didn't know what was going on. This could've been a medical issue. This could've been — I can **probably think** of several different scenarios. **I have no idea what was going on**." *Id.* (emphasis added).[13] Officer McGowan indicated that he did not recognize

_____

[12] Officer McGowan stated they did not brandish a weapon or obstruct Appellee's ability to walk away from the location. *See* N.T., 1/23/20, at 14. He also could not remember where the other officers were located. *See id.* at 37.

[13] Additionally, the officer testified: "I made the observation of him sweating profusely. But that as it was, crawling around on the ground by itself, you
*(Footnote Continued Next Page)*

Appellee from any past encounters. *See id.* at 43. The officer also testified that he did not remember radioing in to obtain information on Appellee's identification and he did not know if he handed it off to a partner to begin a warrant check. *See id.* at 44. Officer McGowan conceded that before he started asking questions, he had no direct evidence that the improperly parked truck was Appellee's vehicle or that he had been driving it. *See id.* at 45. Rather, the officer made the assumption it was Appellee's vehicle "based on [his] close proximity" to the truck. *Id.*

When defense counsel asked Officer McGowan about Appellee's demeanor, he responded Appellee was "[p]retty calm" and that "[t]here was nothing out of the ordinary." N.T., 1/23/20, at 48. The officer was also asked what clues indicated Appellee was purportedly under the influence and he testified to the following:

> I would say the biggest — when [Appellee] got up off of the ground and turned around and he observed me and was sweating profusely, I would say that in that moment — I don't know if **disoriented** is the best word or **caught off guard** or maybe it was his **nervousness** in seeing the police, but I would say **that was the best glimpse I had that something just seemed off**.
>
> And, again, I wasn't sure at that time, was this a medical condition? Was he nervous in seeing the police? Why is he sweating? **I just wasn't sure initially** — at that first contact.

know, it certainly isn't illegal. It caught my attention. And when I'd see[n] him sweating profusely — again, I'm wondering what's going [on], but he walk[ed] into the store, and that was the end of our initial contact." N.T., 1/23/20, at 33.

*Id.* at 48-49 (emphasis added).

Defense counsel also inquired about the second encounter — when Officer McGowan stopped and questioned Appellee after he left the restaurant — the officer **did not note** that Appellee was "profusely sweating." N.T., 1/23/20, at 49. Officer McGowan stated that he never told Appellee that he was free to leave and he "[p]robably" did not tell Appellee that he did not have answer any of the officer's questions. *Id.* at 50. Officer McGowan also never informed Appellee that he had stopped him for a welfare check. *See id.*

In addressing the Commonwealth's argument that the entire interaction between the Appellee and the police constituted a mere encounter and not an investigatory detention, it is necessary to point out that the Commonwealth does highlight certain facts from the initial meeting to support the search during the subsequent encounter. This is apparent given the fluid nature of the two interactions where the second encounter occurred almost immediately after Appellee exited the restaurant, and there were no additional facts concerning Appellee's behavior or circumstances to consider. Indeed, this Court has previously stated in a traffic stop situation, which generally falls along the lines of a *Terry* stop as herein, that "a police officer may use information gathered during an initial traffic stop to justify a second investigatory detention, regardless of whether the officer has indicated at some point during the initial stop that the subject is free to leave."

*Commonwealth v. Galloway*, 265 A.3d 810, 815 (Pa. Super. 2021) (citation omitted).

However, the facts present at the time Officer McGowan stopped Appellee and asked for his identification and permission to search his person amount to the following: (1) Appellee was observed by the officers in a high crime area at 9:30 p.m.; (2) he was crawling on his hands and knees by a parked, albeit askew, truck that was turned off; (3) when Officer McGowan first spoke with him and asked if he was okay, Appellee said that he was looking for something; (4) Appellee was first observed sweating profusely on a May night, when the temperature that day was 86 degrees; (5) Officer McGowan saw that the driver's side window of the truck was down, which he caused him to be curious that the driver was intoxicated or impaired, but Officer McGowan never intended to ask Appellee if he was the driver or to find the driver; (6) the officers observed Appellee go into the restaurant, pace around, and order a drink but not food; (7) Appellee came out of the restaurant, looked at the officers, and then turned right and walked off; (8) the officer did not perceive any indication that Appellee was in an intoxicated state; and (9) as the trial court points out, there was no testimony that

Appellee made any furtive movements or that Officer McGowan felt his safety was at issue.[14]

It is clearly evident that these facts do not a support an objective determination that "criminal activity [was] afoot." **Adams**, 205 A.3d at 1200. Officer McGowan repeatedly testified that he was "curious" of the circumstances, that things seemed a little bit "unusual," and that something was off. However, as noted above, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." **Sokolow**, 490 U.S. at 7 (citations and quotation marks omitted). Officer McGowan's testimony amounted to nothing more than a "hunch" that something was amiss as his "reasonable suspicion" belief stemmed from the fact that they were in a high crime area, the truck was not parked properly even though he never connected Appellee to the vehicle, the fact that the windows were down, and Appellee's state of profuse sweating.

At this juncture, we turn to the Commonwealth's reliance on **Carter**, which we conclude is misplaced. In **Carter**, an *en banc* panel of this Court concluded there was reasonable suspicion where police observed the defendant in a high crime area, walking away from a known drug corner, with a bulge in his coat pocket that appeared to weigh down the jacket, and

_____

[14] **See** Trial Ct. Op., 6/30/20, at 8-9; **see also Commonwealth v. Shelly**, 703 A.2d 499, 503 (Pa. Super. 1997) (safety frisk allowable upon reasonable suspicion criminal activity is afoot and suspect is armed and dangerous).

repeatedly attempting to conceal the bulge in his pocket once alerted to police presence. *Carter*, 105 A.3d at 766-67. *Carter* is factually distinguishable from this case. Here, Officer McGowan did not testify that he observed a bulge in Appellee's clothing or that his clothing appeared to be weighted down. He also never testified that when Appellee stood up after crawling on the ground, he observed Appellee attempting to conceal an item in his pants. Rather, Officer McGowan stated that after questioning Appellee, he made the decision to search — first the pat down Appellee's pockets which revealed nothing, and then the sweep over Appellee's groin area where he felt a bulge. The officer never testified that Appellee was carrying anything in his hands that was suspicious, that he saw Appellee engaging in any criminal activity, or that he was concerned for his own safety.

With this in mind, we will now address the Commonwealth's argument that Officer McGowan's request for Appellee's "identification did not transform the encounter into an unconstitutional detention." Commonwealth's Brief at 14.

We recognize that both the Pennsylvania Supreme Court and "the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification." *Luczki*, 212 A.3d at 543 (citation omitted). We acknowledge that in *Au*, *supra*, the Pennsylvania Supreme Court opined: "Pursuant to governing Fourth Amendment law, we hold that [an] arresting

officer's request for identification [does] not transform his encounter with [the defendant] into an unconstitutional investigatory detention." ***Au***, 42 A.3d at 1009.[15]

However, the Pennsylvania Supreme Court recently revisited the issue regarding a police officer's request for a defendant's identification in ***Cost***, ***supra***. There, police officers were on patrol in a high crime area when they observed the defendant and three other individuals in an alleyway. ***Cost***, 224 A.3d at 642. "The officer suspected 'there might be something going on back there.'" ***Id.*** (record citation omitted). Concerned the individuals were gambling or smoking marijuana, the police officer stopped his vehicle in front of the alleyway to conduct an investigation. ***See id.*** at 634. He and his partner announced that they were police because they were in plain clothes and asked the individuals if they lived in the alleyway. ***See id.***

> Proceeding to ask if the individuals "had ID," the officer testified
> that all of them handed him identification cards of some sort. The

---

[15] In ***Au***, the arresting officer stated that "while on routine patrol in the early morning hours, his attention was drawn to an automobile parked in the lot of a business premises." ***Au***, 42 A.3d at 1003 (record citation omitted). The officer indicated "it was unusual to see a car in the location at such time, and he decided to make further inquiry." ***Id.*** (citation omitted). He "did not activate the emergency lights of his police cruiser, but he positioned his vehicle at an angle relative to the parked automobile so as to illuminate the passenger side." ***Id.*** (citation omitted). He stated he angled the car so as to not block the egress of the defendant's vehicle. ***See id.*** The officer then approached the vehicle with a flashlight and asked the defendant for identification. ***See id.*** When the defendant opened the glove compartment to retrieve his identification, there were two baggies of marijuana. ***See id.*** at 1004.

officer then asked "was there anything — you guys have anything on you I need to know about," to which they also said no.

The officer testified that [the defendant] was removing a backpack, which prompted the officer to ask, "you have anything in that backpack I need to know about?" At that point, [the defendant] admitted that he had a gun in the bag. Subsequently, the partner recovered a handgun.

*Id.* at 643 (record citations omitted). "According to the officer, [the defendant did not] have to answer questions or produce identification; rather, his path was unrestricted, and he could have 'walked off at any time.'" *Id.* (record citations omitted).

The Supreme Court noted:

Most jurisdictions agree that an officer's mere request for identification does not, by itself, transform what would otherwise be a mere encounter into an investigatory detention. However, jurisdictions are deeply divided concerning whether, or to what degree, the retention, by an officer, of the identification documents to search for outstanding warrants escalates the encounter to a seizure.

*Cost*, 224 A.3d at 650 (citations omitted).

The Supreme Court then held "that the retention by police of an identification card to conduct a warrant check will generally be a material and substantial escalating factor within the totality assessment." *Cost*, 224 A.3d at 651. Applying to the facts of the case, the Court opined:

Coupled with other relevant factors in the case, we conclude that the officer's or his partner's retention of [the defendant]'s identification card to conduct a warrant check — as he was asked if there was anything in his backpack that the officer needed to know about — was sufficient to signify to a reasonable person that he was not free to proceed about his business. *Accord* [*State v. Pollman*, 190 P.3d 234, 240 (Kan. 2008),] ("[I]f a law

- 28 -

enforcement officer retains a driver's license, this can be a factor considered in the totality of the circumstances and may, **absent offsetting circumstances**, mean a reasonable person would not feel free to leave without his or her license." (emphasis added)). The announcement of "police," while perfectly understandable, was an initial escalating factor. Albeit that the testimony on the point is quite scant, viewing the record in the light most favorable to [the defendant], it can be concluded that the officers (also quite rationally) adopted a stance that would convey to a reasonable person that such person is perceived as a potential threat. Additionally, we agree with [the defendant] that repeated queries whether there is anything that a police officer "need[s] to know" about within a person's possessions suggests some authoritative right to know about the contents.

It is also significant, in our judgment, that there is no evidence that the officer ever explained to [the defendant] what he intended to do with the identification card. Rather, from all appearances, once [the defendant] gave it to the officer, the officer simply proceeded to do with it as he wished. Again, such treatment of another's property is a substantial escalating factor in terms of the assertion of authority.

*Id.* at 652 (footnote omitted).

Here, the trial court found the facts were very similar to those in *Cost*,

and soundly explained:

Officer McGowan testified that he suspected something was "off" about Appellee, approached Appellee on the street after exiting Harrisburg Fried Chicken, asked Appellee for his identification, Appellee provided his identification to Officer McGowan, and Officer McGowan then asked whether he had anything illegal on his person. While the testimony is not clear whether Officer McGowan had Appellee's identification card in his possession when inquiring whether Appellee had "anything he needed to know about," viewing the record in the light most favorable to Appellee, such conduct could convey to a reasonable person that he was not free to leave; therefore, escalating the encounter to an investigative detention.

Trial Ct. Op., 6/30/20, at 10-11.

- 29 -

We agree with the trial court that **Cost** is applicable to the present matter and, impliedly, that **Au** is not controlling. Officer McGowan did not merely request Appellee's identification like in **Au**. Rather, similar to **Cost**, not only did Officer McGowan and his partner request Appellee's identification, but the officer asked additional questions, including whether Appellee had anything on his person. Furthermore, like in **Cost**, Officer McGowan never explained to Appellee what he intended to do with the identification card. A reasonable person, in Appellee's position, would not have felt free to leave or otherwise terminate the encounter. Accordingly, Officer McGowan's request for identification coupled with investigating questions clearly demonstrated a "substantial escalating factor" within the totality assessment that Appellee was, indeed, subjected to an investigative detention. **Cost**, 224 A.3d at 652.

That assessment, in addition to our above-stated analysis that the Commonwealth failed to establish that Officer McGowan possessed the requisite reasonable suspicion that criminal activity was afoot to justify the investigatory detention of Appellee, leads us to conclude the trial court properly suppressed the evidence resulting from the detention.

To the extent the Commonwealth argues that Officer McGowan was discharging his duties under the public servant exception of the community caretaking doctrine,[16] we find this assertion waived for failure to properly

---

[16] **See** Commonwealth's Brief at 21.

preserve it with the trial court.[17]  **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Lastly, because the police did not possess the requisite level of suspicion to effectuate the seizure, Appellee's consent to the search was vitiated based on the taint of the immediately preceding illegal detention.  **See Commonwealth v. Freeman**, 757 A.2d 903, 909 (Pa. 2000) (determining that the appellant's consent was invalid, and the fruits of the search must be suppressed, because the detention which led to the consent was illegal). Accordingly, we need not address the Commonwealth's remaining claims concerning Appellee's consent and the scope of the consent given.

In sum, we conclude the Commonwealth's arguments are unavailing, the trial court's factual findings are supported by the record, and we discern no error in its grant of Appellee's motion to suppress.

---

[17] Even if the Commonwealth preserved the claim, we would determine that based on the facts before us, Officer McGowan did not "point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer" that Appellee was "in need of assistance." **Livingstone**, 174 A.3d at 634 (citations omitted).  Rather, as noted above, the officer testified that Appellee's situation "could've been a medical issue" but that he had "no idea what was going on."  N.T., 1/23/20, at 31.  Moreover, when the officer observed that Appellee was sweating, he testified that he "wasn't sure at that time" if this was "a medical condition[.]"  **Id.** at 48-49.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/25/2022</u>