**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MIGUEL BELL | : | |
| | : | |
| Appellant | : | No. 1631 EDA 2025 |

Appeal from the Judgment of Sentence Entered May 23, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006504-2024

BEFORE:   OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JUNE 23, 2026**

Miguel Bell appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a stipulated bench trial ended with a guilty verdict on charges of Firearms not to be Carried Without a License[1] and Carrying Firearms on Public Streets or Public Property in Philadelphia.[2]  He contends the trial court erred when it denied his motion to suppress a firearm seized from his person during what he argued was an unconstitutional stop and frisk by police officers.  We affirm.

The notes of testimony taken from the December 12, 2024, hearing on Appellant's motion to suppress provide the facts underlying the issue before us.  Philadelphia Police Department Officer Zachary Stout testified that on

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6106.
[2] 18 Pa.C.S.A. § 6108.

September 5, 2024, fellow Officer Dustin Kology and he were working a plainclothes shift as part of the Five Squad Tactical Unit of the "Violent Crimes Reduction Team." N.T., 12/12/24 (Suppression), at 6. He described their roles in this capacity as "narcotics and gun violence interdiction," in which they patrol in addition to the regular, uniformed patrol officers in that area. N.T. at 8. They "respond to areas where there are recent shootings and, hopefully, remove illegal firearms off the streets of Philadelphia." N.T. at 6.

Their assignment took them to one of the city's "main shooting grids," specifically, the 2100 block of West Indiana Avenue in the 39th District—the North Philadelphia, Nicetown, Germantown area. N.T. at 7-8. At 6:32 p.m., they observed from their unmarked vehicle Mr. Bell walking down a residential block of West Indiana Avenue. What initially drew Officer Stout's attention to Bell was that he was wearing a "satchel," or "cross-body bag," that rested down near his hip. N.T. at 10. Officer Stout testified that as the officers drove closer he could see the bag appeared to be heavy when Bell moved it to the other side of his body and out of the officers' view. "There was obviously something in it, due to the way it was stuffed[,]" the officer continued. N.T. at 10.

Officer Stout testified that Officer Kology said he recognized Mr. Bell from a prior police interaction and told him that Bell was not permitted to carry a firearm. *Id*. At that time, the officers stopped the car, and Officer Kology asked Bell from inside the car if he was carrying a firearm. N.T. at 11-12. Bell replied, "I don't think so," while again repositioning the bag back to the

rear of his body, stepping back away from the officer's vehicle, and nervously looking around. N.T. at 12.

According to Officer Stout, he observed Bell for about 15 to 20 seconds from the car before he "slowly stepped out of the police vehicle and walked towards [Bell,] [a]t which point, [Bell] began to back into the lot." N.T. at 12. As the officer reached for the bag, he grabbed Mr. Bell's right wrist and at the same time "immediately felt what [he] knew to be a firearm in that bag." N.T. at 12.[3] Officer Stout "took [Mr. Bell] to the ground and recovered a firearm with said bag, along with a magazine and box of ammunition." N.T. at 12. The Commonwealth admitted the two officers' "body cam" videos to corroborate Officer Stout's testimony. N.T. at 15-16.

Defense counsel cross-examined Officer Stout, first by asking if he would confirm the testimony he gave at the preliminary hearing that he did not see anything like an "L-shaped object or bulge" in Bell's bag prior to commencing the stop. N.T. at 17. Officer Stout confirmed this testimony. N.T. at 17.

Defense counsel followed by asking if the officer then would agree that the lack of a specific impression made from the bag, itself, combined with Bell's negative reply to the question asking if a gun was in the bag, left the officer with no reason to believe Appellant possessed a gun. N.T. at 18.

---

[3] Officer Stout testified that he "knew from [his] prior training and recovering firearms inside of bags and other things before[, that] what [he] was feeling was a handgun." N.T. at 12-13.

Officer Stout disagreed, answering that Bell not only nervously offered an odd reply of, "I don't think so," to a "yes-or-no" question asking if he had a gun in his bag but also moved defensively and evasively and began "randomly talking about things that didn't matter . . . things that were going on down the street," which only amplified the officers' suspicion. N.T. at 18.

Also, Officer Stout reiterated that he relied on the totality of circumstances such as the weight of the item in the bag as he had inferred from both his initial observation and watching Bell later switch the bag's location to behind his body, Bell's guarded behavior of turning his body to block the officer's view of and access to the bag—even though the officer had not issued a command or exhibited a show of force, and Bell's nervous and evasive words, all of which the officer considered in forming what he believed to be a reasonable suspicion that Appellant possessed a gun. N.T. at 19-22.

At the conclusion of the December 12, 2024, hearing, the suppression court denied Bell's motion to suppress the handgun, as it determined that the *Terry* stop and frisk was supported by a reasonable suspicion of unlawful gun possession formed during the officers' patrol car observations of and mere encounter with him. N.T., 12/12/24, at 50.

On March 7, 2025, the trial court presided over a stipulated bench trial and found Bell guilty on the two firearms charges. On May 23, 2025, the trial court sentenced Bell to two to four years' incarceration on the Section 6106

charge and imposed no further penalty on the Section 6108 charge. This timely appeal follows.[4]

Bell has filed a court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal that presents the following question:

> Did the trial court err in denying Miguel Bell's motion to suppress the firearm police seized from the bag he carried as police had no reasonable suspicion to stop and frisk him?

Brief of Appellant, at 2.

Our standard of review for the denial of a suppression motion is well settled:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.
>
> Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre[ ]trial motion to suppress.

**_Commonwealth v. Carey_**, 249 A.3d 1217, 1223 (Pa. Super. 2021) (citation omitted).

_____

[4] Appellant did not file post-sentence motions.

Our jurisprudence recognizes three categories of warrantless interactions between citizens and police officers.

> The first [type of interaction] is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity.... The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid[,] police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause....
>
> No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person.

*Commonwealth v. Anderson*, 276 A.3d 282, 293-94 (Pa. Super. 2022) (*en banc*), *quoting* *Commonwealth v. Adams*, 205 A.3d 1195, 1199-1200 (Pa. 2019) (internal citations omitted). In applying this "free to leave" test, the focus is "whether the suspect has in some way been restrained by physical force or show of coercive authority." *Commonwealth v. Joyner*, 348 A.3d 230, 236 (Pa. Super. 2025) citing *Commonwealth v. Parker*, 161 A.3d 357, 363 (Pa. Super. 2017).

"Both the Fourth Amendment [to] the United States Constitution and Article [I], Section 8 of the Pennsylvania Constitution guarantee individuals freedom from unreasonable searches and seizures." *Commonwealth v. Duke*, 208 A.3d 465, 470 (Pa. Super. 2019) (citation and quotation marks omitted). "A warrantless search or seizure is presumptively unreasonable under the Fourth Amendment and Article I, § 8, subject to a few specifically established, well-delineated exceptions." *Commonwealth v. Smith*, 285 A.3d 328, 332 (Pa. Super. 2022) (quotation marks and citation omitted). "Exceptions to the warrant requirement include, *inter alia*, the stop and frisk exception, *Commonwealth v. Simonson*, 148 A.3d 792, 797 (Pa. Super. 2016) (quotation marks and citation omitted). This case implicates the stop and frisk exception to the warrant requirement.

The Pennsylvania Supreme Court has summarized the two conditions necessary for a stop and frisk to be constitutionally sound:

> First, the investigatory stop must be lawful. That requirement is met in an on-the street encounter ... where the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person is armed and dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009).

*Int. of T.W.*, 261 A.3d 409, 417 (Pa. 2021) ("[I]t is reasonable under the Fourth Amendment for [a] brief stop to also include a frisk of the suspect's

outer clothing where the police officer has reason to believe the suspect is 'armed and dangerous." (quoting ***Terry v. Ohio***, 392 U.S. 1, 30 (1968)).

"The purpose of the frisk ... is to dispel a reasonable fear that the stopped suspect possesses a weapon which could be used to harm a police officer or the public during the stop." ***Id.*** Courts apply an objective standard to determine "whether there is reasonable suspicion that a suspect is armed[.]" ***Id***. To conduct a ***Terry*** frisk, "police officers 'need not be absolutely certain that the individual is armed' but rather the appropriate standard is 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" ***Id***. (citation omitted).

"If a police officer conducting a lawful ***Terry*** frisk detects an object within a suspect's clothing, ... a police officer may remove an object from within a suspect's clothing under the reasonable suspicion that the object is a weapon" or "if, by touch, it is immediately apparent that the object is illegal contraband." ***Id.*** at 422. A court may be "guided by common sense concerns, giving preference to the safety of the officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon." ***Commonwealth v. Wright***, 224 A.3d 1104, 1109 (Pa. Super. 2019) (quoting ***Commonwealth v. Mack***, 953 A.2d 587, 590 (Pa. Super. 2008)).

Viewing Officer Stout's testimony in light of the totality of evidence he and Officer Kology witnessed against the backdrop of the high-gun violence

neighborhood and Bell's status as a person not to possess, we discern no error with the trial court's order denying Bell's motion to suppress. The initial interaction between the officers and Bell occurred during daylight hours on a public sidewalk, where the officers remained seated inside their unmarked patrol car parked along the curb and asked Bell if he was carrying a gun in his bag. This question did not elevate the interaction from a mere encounter to an investigatory detention. **See Joyner**, **supra** (mere encounter continued where officer, who remained seated in patrol car and effected no outward official signs of compulsion such as engaging the vehicle's sirens or lights, leaving the vehicle, or brandishing a weapon, asked Joyner, "Do you have a gun?" and followed a negative answer with, "Are you sure?"). **See also Commonwealth v. Taylor**, (unpublished memorandum) No. 1141 EDA 2024, 2025 WL 1938730 (Pa. Super. filed July 15, 2025) (mere encounter where officers suspected defendant of possession of concealed firearm, pulled up in police vehicle, asked "if he had permit to carry," officer opened door of patrol car after defendant answered, at which point defendant fled).

As was the case in **Joyner**, there was no evidence here that Officers Kology and Stout either positioned the car, spoke in a tone of voice, or adopted a demeanor during for the approximately 15 to 20 seconds they witnessed and spoke to Bell from the car that conveyed he was not free to leave. During this time, they asked if he was carrying a gun in his satchel, and according to their testimonies, which the trial court accepted as true, Bell provided the equivocal, guarded answer of, "I don't think so," instead of, "no," and adopted

a defensive posture by stepping backwards, turning or "blading" his body away from the officers, and repositioning the bag to behind his body as if to obscure the officers' view of it. N.T. at 31. According to the officers, Bell's evasive words and actions were followed by the onset of his rapid breathing and sweating, which the officers noted as being part of Bell's "incredibly nervous" presentation at that point. N.T. at 35.

Bell's nervous and evasive responses to the officers' question had occurred during a mere encounter in a designated high-gun violence neighborhood, and Officer Stout believed at that moment that the totality of circumstances gave them a reasonable suspicion that the heavy item "stuffed" in the bag Bell was carrying was a handgun. N.T. at 18. He testified that he exited the vehicle, walked up to Bell, and conducted a *Terry* frisk of Bell and felt through the material of the bag what he identified as a gun. *See Commonwealth v. Rice*, 304 A.3d 1255, 1262-63 (Pa. Super. 2023) (concluding officers had reasonable suspicion to conduct investigative detention where officers observed appellee in high crime area with "L" shaped bulge in his waistband, and appellee turned and walked away from police when asked to "come here"); *Joyner* (collecting cases in which defendants' evasive behaviors in a high crime area, in combination with other factors such as suspected possession of a concealed weapon contributed to officers' reasonable suspicion of unlawful gun possession).

We agree with the trial court that the totality of evidence known to the officers prior to the time they seized Bell and felt the exterior of his satchel

had supplied them with a reasonable suspicion that he was carrying a concealed gun unlawfully. Accordingly, we discern no error with the trial court's denial of Appellant's motion to suppress and affirm judgment of sentence.

Judgment of sentence is affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/23/2026