J-A18039-21

2021 PA Super 231

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ARHAWN JONES | : | |
| | : | |
| Appellant | : | No. 776 WDA 2020 |

Appeal from the Judgment of Sentence Entered June 25, 2020
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0013375-2019

BEFORE: OLSON, J., NICHOLS, J., and MUSMANNO, J.

OPINION BY MUSMANNO, J.: **FILED: NOVEMBER 29, 2021**

Arhawn Jones ("Jones") appeals from the judgment of sentence imposed following his conviction of firearms not to be carried without a license.[1] We affirm.

On September 18, 2019, City of Pittsburgh Police Officers Ryan Tranter ("Officer Tranter") and Gardocki,[2] while in uniform and driving a marked police

---

[1] 18 Pa.C.S.A. § 6106.

[2] Officer Gardocki's first name does not appear in the certified record.

vehicle, were on patrol near East Ohio Street and responding to a burglary call.[3]  N.T. (Suppression), 6/10/20, 4-6.  As the officers were driving on East Ohio Street towards Interstate-279, Officer Tranter observed Jones walking on the sidewalk, and noted an L-shaped bulge in Jones's right jacket pocket. *Id.* at 6-7.  Officer Tranter "immediately recognized that large bulge as a firearm and looped back around and pulled ahead of [] Jones…." *Id.* at 7.[4]

Officer Tranter "swung the vehicle around and pulled past [] Jones[.]" *Id.* at 10, 11-12.  Officers Tranter and Gardocki exited the police cruiser.  *Id.* at 10.  Officer Tranter "cut back behind the vehicle and started to cross the street.  It was at that time [Officer Tranter] just struck up a conversation with [] Jones, [`]hey, what's up.[']  [Officer Tranter] asked [Jones] how old he was and that is when he replied [that he was] 18." *Id.*  Because Jones stated that he was 18 years old, Officer Tranter knew that Jones was not old enough to

---

[3] During the suppression hearing, Officer Tranter did not state what time this incident occurred, beyond a brief statement that East Ohio Street is "always very crowded, very packed during 4:00 p.m., which it was, so there was traffic."  N.T. (Suppression), 6/10/20, at 9.  Officer Tranter testified that he believed the incident took place in the evening, and "it was still light out." *Id.* at 11.  In the Affidavit of Probable Cause, Officer Tranter indicated that he observed Jones in the 400 block of East Ohio Street at approximately 4:25 p.m.  Criminal Complaint and Affidavit of Probable Cause, 9/18/19.

[4] In the Affidavit of Probable Cause, Officer Tranter averred that "Jones appeared to be exceptionally young[,] as if he were a juvenile and well under the age of 21 years old."  Criminal Complaint and Affidavit of Probable Cause, 9/18/19.  However, the transcript of the suppression hearing contains no testimony by Officer Tranter that he immediately identified that Jones was under the age of 21.

lawfully possess a firearm. *Id.* at 12. Jones was subsequently arrested and charged with firearms not to be carried without a license and receiving stolen property.[5, 6]

On February 20, 2020, Jones filed a Motion to Suppress all evidence recovered during the search. Specifically, Jones argued that the police officers lacked reasonable suspicion to stop and search him based solely on a "hunch" that Jones was carrying a firearm. The suppression court conducted a hearing, after which it denied Jones's Motion to Suppress.

The matter proceeded to a stipulated bench trial. The parties stipulated to (1) the facts set forth in the Affidavit of Probable Cause, (2) the Pennsylvania State Police letter verifying that Jones did not have a license to carry a firearm, and (3) the operability of the recovered firearm. The parties also agreed to incorporate the testimony from the suppression hearing. Following the bench trial, Jones was convicted of firearms not to be carried without a license. The trial court sentenced Jones to 2 years of probation, the first 12 months of which were to be served on electronic monitoring. Jones

---

[5] Officer Tranter did not specify when, during this interaction, he seized the firearm. However, Officer Tranter's testimony that "[he] took over" after Jones said he was 18 years old implies that the seizure occurred after Jones disclosed his age. N.T. (Suppression), 6/10/20, at 16. In its Opinion, the trial court indicated that Officer Tranter had stopped and searched Jones after learning that Jones was 18 years old, and therefore too young to possess a firearm. Trial Court Opinion, 3/31/21, at 4.

[6] 18 Pa.C.S.A. § 3925(a). The firearm had been reported as stolen. The receiving stolen property charge was later withdrawn.

filed a timely Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise

Statement of errors complained of on appeal.

Jones now raises the following issue for our review:

Was [] Jones subject to an unlawful seizure where two uniformed police officers approached him in a marked police cruiser, blocked his path to cross the street, pursued him on foot, and subjected him to questioning, all without reasonable suspicion?

Brief for Appellant at 4.

Jones claims that the suppression court erred in denying his Motion to

Suppress, because he was subject to an unlawful seizure, which was

unsupported by reasonable suspicion. *Id.* at 10. Jones argues that, "[g]iven

the totality of these circumstances, no reasonable person in [] Jones'[s]

position would have felt free to ignore Officer Tranter's questioning and leave

the area." *Id.* According to Jones, the police cruiser physically blocked him

from crossing the street and constrained his movement. *Id.* at 12, 14. Jones

further asserts that Officer Tranter's questioning concerning his age was

significant only to implicate Jones's participation in illegal activity. *Id.* at 12.

Citing our Supreme Court's decision in *Commonwealth v. Hicks*, 208 A.3d

916 (Pa. 2019),[7] Jones contends that Officer Tranter's belief that Jones was carrying a firearm, without additional circumstances to suggest criminal activity, did not give rise to reasonable suspicion. *Id.* at 15.

We adhere to the following standard of review:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are

---

[7] In **Hicks**, police stopped Hicks's vehicle in a gas station parking lot based on information that he was in possession of a firearm. **Hicks**, 208 A.3d at 922. An officer restrained Hicks's arms and removed his handgun from his holster, and a search of the vehicle followed. *Id.* Police later determined that Hicks possessed a valid license to carry a concealed firearm, and he was not statutorily prohibited from possessing a firearm. *Id.* Relevantly, Hicks was not charged with firearms offenses. *Id.* The trial court denied suppression, reasoning that possession of a concealed weapon justifies an investigatory stop to determine whether the individual has a license. *Id.* at 922-23.

Ultimately, the Pennsylvania Supreme Court evaluated whether carrying a concealed firearm could justify an investigative detention. *Id.* at 934; *see also id.* (limiting its analysis to "the antecedent justification for a 'stop'" and specifically declining to address "whether a police officer who has effectuated a lawful investigative detention may treat the suspect's possession of a firearm as *per se* authorization to 'frisk' the detainee."). The Supreme Court first recognized that an individual may legally carry a concealed firearm in public if he is licensed to do so. *Id.* at 926. The Court further recognized that it is impossible to ascertain an individual's licensing status from his appearance. *Id.* at 937. Following an extensive review of applicable Fourth Amendment jurisprudence, *see id.* at 930-36, the Court concluded that there is "no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public." *Id.* at 936. Thus, possession of a concealed firearm "alone is an insufficient basis for reasonable suspicion that criminal activity is afoot." *Id.* at 945.

supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation, brackets and ellipses omitted).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. Because interactions between law enforcement and the general citizenry are widely varied, search and seizure law looks at how the interaction is classified and if a detention has occurred.

*Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super. 2019) (internal citations and quotation marks omitted).

Our Supreme Court has explained the three types of interactions between law enforcement and private citizens as follows:

The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way. The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a

- 6 -

person, and to be constitutionally valid[,] police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.

No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person.

*Commonwealth v. Adams*, 205 A.3d 1195, 1199-1200 (Pa. 2019) (citations, brackets and some quotation marks omitted).

Further, in considering whether a seizure occurred, or whether a reasonable person would feel free to leave, courts may examine the following:

[T]he number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Commonwealth v. Beasley*, 761 A.2d 621, 624-25 (Pa. Super. 2000) (citation omitted). Further, "[w]ith respect to the show of authority needed for a detention, the circumstances must present some level of coercion, beyond the officer's mere employment, that conveys a demand for compliance or threat of tangible consequences from refusal." *Luczki*, 212 A.3d at 544.

During the suppression hearing, Officer Tranter testified that on September 18, 2019, he and Officer Gardocki responded to a burglary call in a marked police cruiser in the area of East Ohio Street. N.T. (Suppression), 6/10/20, at 5-6. Officer Tranter described the surrounding neighborhood as a high-crime area, with "open narcotics sales and people possessing firearms illegally. Constantly getting 911 calls in that direct area." *Id.* at 6.

While the officers were driving on East Ohio Street, towards Interstate-279, Officer Tranter observed Jones walking on the sidewalk. *Id.*; *see also id.* at 9 (wherein Officer Tranter testified that Jones was walking towards the police cruiser, such that Officer Tranter could clearly see the front of Jones's body). Officer Tranter testified that he observed an L-shaped bulge in Jones's right jacket pocket, which he immediately recognized as a firearm, based on his training and experience. *Id.* at 6-7.

Officer Tranter testified that, after observing what he believed to be a firearm, he "swung the vehicle around and pulled past [] Jones…." *Id.* at 10; *see also id.* at 15 (wherein Officer Tranter testified that he pulled the vehicle past Jones). The officers did not activate the police cruiser's lights or sirens. *Id.* at 10. According to Officer Tranter, as he pulled the cruiser to the curb, Jones walked behind the car and began to cross the street. *Id.* at 10, 11-12. Officers Tranter and Gardocki then exited the vehicle. *Id.* at 10.

Officer Tranter testified, "It was at that time I just struck up a conversation with [] Jones, [`]hey, what's up.[']  I asked him how old he was and that is when he replied 18." *Id.*; *see also id.* at 12 (wherein Officer

- 8 -

Tranter stated that he was standing behind Jones when he started to ask him questions); 13 (wherein Officer Tranter indicated that his sole inquiry was to Jones's age). Officer Tranter described his demeanor during the interaction as "very relaxed." *Id.* at 12. Officer Tranter testified that prior to Jones providing his age, Jones was never ordered to stop, and was free to leave. *Id.* at 13. Jones's response was significant to Officer Tranter, because "[Jones] being 18[,] he wouldn't be legally allowed to be possessing a firearm." *Id.* at 12.

Following the suppression hearing, the suppression court set forth its findings and conclusions as follows:

> 1. The court finds Officer Tranter's testimony to be credible.
>
> 2. The court finds [Jones] was not seized or detained by [Officer Tranter].
>
> 3. [Jones] was free to leave the area and free to choose not to tell the officer his age.
>
> 4. The search of [Jones] and seizure of the firearm was lawful.

Findings of Fact and Conclusions of Law, 6/24/20, at 2 (unpaginated) (numbering added). Additionally, in its Rule 1925(a) Opinion, the trial court explained as follows:

> After [Jones] told [Officer Tranter] his age, he was never ordered to stop, never detained, that he was free to leave the area.
>
> Based upon the evidence presented at the suppression hearing, and the totality of the circumstances, [Jones] was not "seized" by the police. There were no sirens or emergency lights activated by the police. [Jones] was not physically stopped. The

- 9 -

police did not draw their weapons. The initial encounter with [Jones] was brief. [Jones] was asked his age, and he voluntarily responded to the police officer's question. The interaction with police was a mere encounter and not a seizure. … When [Jones] said he was 18 years old, [Officer Tranter] realized that [Jones] was too young to lawfully possess a firearm. It was, at that time, along with his observations and belief that [Jones] was carrying a concealed firearm in his jacket, that [Jones] was stopped, and searched, and a gun recovered from his person.

Trial Court Opinion, 3/31/21, at 3-4 (citations to record omitted).

Upon review, we conclude that the suppression court's factual findings are supported by the evidence of record, and thus, we are bound by those findings. *See Jones*, *supra*. Officer Tranter's testimony at the suppression hearing,[8] viewed in the light most favorable to the Commonwealth, established that Officer Tranter observed Jones walking on the sidewalk with an L-shaped bulge in his right jacket pocket, which Officer Tranter immediately recognized as a firearm. At the time of the initial contact, *i.e.*, when Officer Tranter exited the marked police cruiser and addressed Jones, Officer Tranter did no more than ask Jones his age. This single question did not transform the mere encounter into an investigatory detention. *See Beasley*, 761 A.2d at 624 (stating that "[n]o constitutional provision prohibits police officers from approaching a citizen in public to make inquiries of them."); *see also*

_____

[8] Officer Tranter was the only witness presented during the suppression hearing, and the suppression court specifically credited his testimony. *See Commonwealth v. Tillery*, 249 A.3d 278, 282 (Pa. Super. 2021) (stating that "it is within the suppression court's sole province to pass on witness credibility and this Court cannot upset credibility determinations.").

*Commonwealth v. Young*, 162 A.3d 524, 529 (Pa. Super. 2017) (stating that "both the United States and Pennsylvania Supreme Courts have held that the approach of a police officer followed by questioning does not constitute a seizure." (citation, brackets and quotation marks omitted)). Additionally, the officers did not activate the cruiser's lights and sirens, or brandish their weapons when they exited the vehicle. Thus, absent further evidence suggesting coercion by Officer Tranter "convey[ing] a demand for compliance or threat of tangible consequences from refusal[,]" *Luczki*, 212 A.3d at 544, we are constrained to agree with the suppression court's conclusion that this interaction constituted a mere encounter. *See Young*, 162 A.3d at 529-30 (concluding that the interaction between police officers and the defendant constituted a mere encounter, where the plainclothes officers stopped near defendant on the street, exited their unmarked car but identified themselves as law enforcement, and asked the defendant whether he had anything "that could harm" the officers); *see also Commonwealth v. Lyles*, 54 A.3d 76, 83 (Pa. Super. 2012) (concluding that police officers' request for identification did not escalate a mere encounter into an investigative detention, where there was no credible evidence that the officers made intimidating movements; the officers did not brandish weapons; there was no threat of consequences for non-compliance; and the officers' only demand was for the appellee to keep

his hands out of his pocket).[9] Accordingly, we cannot grant Jones relief on this claim.

We are sympathetic to Jones's assertion that, "[t]o hold that a reasonable, innocent person in [] Jones'[s] position would have felt free to continue walking and ignore Officer Tranter's questioning, confident that he would not be further pursued or impeded by the officers, would be to ignore the realities of human nature." Brief for Appellant at 13.

Pennsylvania courts have long "recognize[d] the conceptual difficulties inherent in the administration of the reasonable-person standard. Although the test is cast in objective terms, absent empirical proofs, there remains substantial room for reasonable disagreement concerning how such a hypothetical person might feel in any given set of circumstances." *Luczki*, 212 A.3d at 544 (citing *Commonwealth v. Au*, 42 A.3d 1002, 1007 (Pa.

_____

[9] Because the *Hicks* Court explicitly limited its holding to *seizures* based upon possession of a concealed firearm, *Hicks* does not control the outcome of Jones's claim. *See Hicks*, 208 A.3d at 934, 936, 945. However, we suggest that "merely" asking an individual for his age, with the clear purpose of establishing whether he could legally carry a firearm if licensed to do so, is fundamentally no different than stopping an individual to verify his licensing status. We also observe that, here, Officer Tranter did not testify at the suppression hearing that it was readily apparent to him that Jones was under the age of 21.

2012)).[10]  Indeed, even an individual with a thorough understanding of the law would not feel free to leave a situation in which the police initiate an interaction.  As the Honorable Eugene B. Strassburger previously emphasized,

> case law has developed into an Alice in Wonderland scenario, as judges attempt to determine if an individual is or is not free to leave.
>
> When a police officer initiates an encounter, an individual as a practical matter **never** feels free to leave.  The police officer has a weapon.  The police officer's testimony is almost always believed in court.  No reasonable person would walk away from an encounter with a police officer.
>
> Lawyers, judges and law professors can debate the niceties as to whether an individual is legally free to leave, but the case law does not comport with reality.

*Lyles*, 54 A.3d at 84 (Strassburger, J., concurring) (emphasis in original).

---

[10] In a 2008 study, David K. Kessler reviewed federal seizure law and the "free to leave" standard, as applied by the United States Supreme Court.  *See* David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. CRIM. L. & CRIMINOLOGY 51, 55-60 (Fall 2008).  Kessler emphasized a lack of empirical evidence concerning "when a person would feel free to leave an encounter with the police."  *Id.* at 61.  In response to this apparent need, Kessler developed a survey, which asked participants whether they would feel free to leave two situations—an encounter with police on the sidewalk, and an encounter with police on a bus—and additionally asked participants to choose from four options to best describe their legal rights during such an encounter.  *Id.* at 68-71.  The survey data indicated that (1) most people would not feel free to leave in either encounter; (2) women and individuals under the age of 25 feel less free to leave than individuals not in those categories; and (3) even those who knew their legal right to leave these situations would not feel free to do so.  *Id.* at 73; *see also id.* at 73-79. Kessler posited, based on the survey results, that "the Supreme Court's use of its seizure standard has been inconsistent with the reality of how people feel when interacting with police officers."  *Id.* at 81.

It is time to dispel the notion of a "mere encounter." The concept is a legal fiction, entirely divorced from reality. Nevertheless, based upon the law as it presently exists, we must affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Nichols joins the opinion.

Judge Olson concurs in the result.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2021