J-A21041-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JANNAI YOUNG | : | |
| | : | |
| Appellant | : | No. 2992 EDA 2022 |

Appeal from the Judgment of Sentence Entered September 15, 2022
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0004290-2021

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 08, 2024**

Appellant, Jannai Young, appeals from the aggregate judgment of sentence of three to six years' incarceration, followed by one year probation, imposed after a jury convicted him of carrying a firearm without a license, 18 Pa.C.S. § 6106(a)(1). On appeal, Appellant challenges the trial court's denial of his pretrial motion to suppress evidence obtained during what Appellant claims was an illegal stop, seizure, and frisk. After careful review, we affirm.

Briefly, Appellant was arrested and charged with the above-stated offense after a vehicle in which he was riding was stopped by police. During the stop, Appellant was removed from the vehicle and frisked, which revealed a firearm in his possession. It was later discovered that Appellant was not licensed to carry that weapon.

Prior to trial, Appellant filed a motion to suppress the evidence recovered during his stop and frisk, and the court conducted a suppression hearing on

April 20, 2022. On June 2, 2022, the court issued an order denying Appellant's motion to suppress. His case proceeded to a jury trial and, on August 12, 2022, Appellant was convicted of possessing a firearm without a license. On September 15, 2022, he was sentenced to the term set forth *supra*.

On September 26, 2022, Appellant filed a timely, post-sentence motion. Initially, this motion was not docketed or included in the certified record. However, the docket contains an order titled, "Notice Of Hearing," that was filed September 28, 2022, which directed the Commonwealth to show cause why the "within Post Sentence Motion, should not be granted." Order, 9/28/22, at 1 (unnumbered). Additionally, on October 20, 2022, an "Order Denying Defendant's Post-Sentence Motion" was entered. On November 18, 2022, the instant, counseled notice of appeal was filed.

On February 28, 2023, this Court issued a rule to show cause why this appeal should not be quashed as untimely filed on November 18, 2022, from the judgment of sentence imposed on September 15, 2022, given that the docket and record did not contain any post-sentence motion filed by Appellant. *See* Pa.R.A.P. 105(b) (providing that an appellate court "may not enlarge the time for filing a notice of appeal"); Pa.R.A.P. 903(c)(3) ("In a criminal case in which no post-sentence motion has been filed, the notice of appeal shall be filed within 30 days of the imposition of the judgment of sentence in open court."). On March 3, 2023, Appellant's counsel filed a response stating that a timely post-sentence motion had been filed on Monday, September 26, 2022, but it was not properly docketed or included in the certified record. On

that same date, this Court received a supplemental record containing a corrected trial court docket indicating that a post-sentence motion was filed on September 26, 2022. The supplemental record also contained that post-sentence motion with a date stamp of September 26, 2022. On May 1, 2023, this Court entered an order discharging the show cause order and deferring the timeliness issue to the merits panel for review. Given this record, we conclude that Appellant timely-filed a post-sentence motion, and his appeal was timely filed from the court's order denying it.

On December 8, 2022, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and he timely complied. The court thereafter filed a Rule 1925(a) opinion. Herein, Appellant states two issues for our review, which we reorder for ease of disposition:

1. Whether this appeal was untimely filed such that it should be quashed?

2. Whether the trial court erred by denying [A]ppellant's motion to suppress physical evidence and statements where law enforcement lacked reasonable suspicion to stop [A]ppellant and probable cause to arrest him based solely upon information from a confidential informant [(CI)] that [A]ppellant was in possession of a firearm, in violation of the United States and Pennsylvania Constitutions?

Appellant's Brief at 3.

Given our discussion and conclusion, *supra*, that Appellant's appeal is timely, we need not discuss his first issue any further.

In regard to Appellant's second issue, he challenges the trial court's denial of his pretrial motion to suppress evidence.

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

***Commonwealth v. Smith***, 164 A.3d 1255, 1257 (Pa. Super. 2017) (cleaned up).

Instantly, Appellant presents two distinct claims, first challenging the legality of the stop of the vehicle in which he was riding, and second arguing that, even if the stop of the vehicle was legal, it was unlawful for police to remove him from the vehicle and frisk him, which revealed that he possessed a gun. We will address each claim in turn, beginning by setting forth the findings of fact and conclusions of law of the suppression court:

> 1. On April 20, 2022, a suppression hearing was held wherein the Commonwealth elicited testimony from Captain Matthew Goldschmidt, Officer Thomas Geromichalos, and Officer Michael Smalarz.

***

- 4 -

7. On August 3, 2021, at approximately 6:00 p.m., Captain Goldschmidt received a phone call from a [CI].... N.T., 4/20/22[, at] 14.

8. The CI told Captain Goldschmidt that a male (later identified as [Appellant]) was in possession of a 9-millimeter handgun and that he was entering a white van with a Delaware registration tag. [*Id.*]

9. The CI relayed that the van was currently in the 2700 block of Mary Street, the alleyway behind the 2700 block of West Third Street. [*Id.* at] 14-15.

10. The area is considered a high drug and high crime area, with shootings, homicides, aggravated assaults, robberies, gun arrests, and similar violence. [*Id.* at] 27.

11. As the van was moving, the CI was dictating its movements to Captain Goldschmidt. The van traveled down Mary Street and then made a right turn onto the 200 block of Highland Avenue, where it traveled northbound down Highland Avenue towards the 900 block. [*Id.* at] 15.

12. Captain Goldschmidt radioed the information out to Officers Geromichalos and Smalarz, who were on patrol in that area. [*Id.*]

13. Within a matter of minutes, Officer Geromichalos radioed that he observed the vehicle in question exactly where the CI said it would be traveling. [*Id.* at] 18.

14. Captain Goldschmidt received a second radio call that a traffic stop was initiated on the right-hand shoulder of I-95 South. [*Id.* at] 20.

15. Captain Goldschmidt arrived at the location of the stop and observed the white van with Delaware tags, with an older female driver and [Appellant] and a young child in the back of the vehicle. [*Id.* at] 20.

16. Officer Geromichalos had walked back to his patrol vehicle in order to run the driver's license and registration while Officer Smalarz had placed himself on the driver's side of the car, namely in the rear where [Appellant] was seated. [*Id.* at] 21.

17. Officer Smalarz asked Captain Goldschmidt to come around to his side because he observed a bulge in [Appellant]'s waistband

area and [Appellant's] demeanor was overly nervous and he was sweating profusely. [*Id.*]

18. Captain Goldschmidt acknowledged that most people are nervous when stopped by police; however, [Appellant's] nervous behavior was over and above the standard nerves. [*Id.*]

19. Captain Goldschmidt also observed the bulge in [Appellant's] waistband. [*Id.* at] 22.

20. Captain Goldschmidt observed Officer Smalarz ask [Appellant] to step out of the vehicle; he complied, and Officer Smalarz conducted a brief search for officer safety and recovered a 9-millimeter firearm from [Appellant's] waistband. [*Id.* at] 23.

21. The entire stop from start to finish was approximately fifteen minutes. [*Id.*]

22. With regard to the CI, Captain Goldschmidt testified that he has worked with the CI for a little over a year and that the CI has also worked with other officers in the Department for more years than he has. [*Id.* at] 24.

23. The CI normally relays the location of people who are carrying guns and/or narcotics. [*Id.* at] 25.

24. The CI's information has led to arrests as well as convictions and Captain Goldschmidt has personally had the occasion to verify and corroborate the information from the CI at least six or seven times prior to the information given in this case. [*Id.*]

25. Prior to the traffic stop of [Appellant], the CI previously relayed information to Captain Goldschmit that [Appellant] had been walking around with a firearm. The CI would provide a location and Captain Goldschmidt would go to the location where he would see [Appellant] but, prior to this occasion, it was always at a place where Captain Goldschmidt could not safely approach [Appellant]. [*Id.*]

\*\*\*

28. Officer Thomas Geromichalos testified that he is currently employed with the City of Chester Police Department and has been so employed for the past two years, prior to which he served as a patrolman for Morton Borough for approximately one year. [*Id.* at] 57.

29. Officer Geromichalos corroborated Captain Goldschmidt's testimony that he was on patrol on August 3, 2021, at approximately 6:00[]p.m., in full uniform and a marked patrol vehicle when he received a radio call from Captain Goldschmidt regarding the white van with Delaware plates traveling in the area of the 900 block of Hyland Avenue. [*Id.* at] 60.

30. Within a few minutes of the radio call, Officer Geromichalos observed the vehicle in the 1200 block of Hyland Avenue, traveling northbound. [*Id.* at] 61.

31. Officer Geromichalos observed the van and radioed in that he could conduct the stop. In the interim, Officer Geromichalos witnessed the van fail to signal a right hand turn as well as its unsecured registration tag; both [M]otor [V]ehicle [C]ode violations. [*Id.*]

32. While traveling on I-95, Officer Geromichalos activated his lights in order to signal a traffic stop. [*Id.* at] 63.

33. Officer Geromichalos testified that he would have pulled the van over for the [M]otor [V]ehicle [C]ode violations even without the CI's tip about the firearm, and vice versa. [*Id.*]

34. Officer Geromichalos approached the driver's side vehicle and made contact with the driver, later identified as [Appellant's] mother[,] who provided him with license and registration. Officer Geromichalos observed a male in the back passenger compartment who matched the description given by the CI. [*Id.* at] 65.

35. As Officer Geromichalos was walking back to his vehicle in order to run the registration and license, Officer Smalarz and Captain Goldschmidt arrived on scene. [*Id.* at] 66.

36. When Officer Geromichalos observed that Officer Smalarz and Captain Goldschmidt had removed [Appellant] from the vehicle, he immediately exited his patrol vehicle in order to assist. [*Id.* at] 70.

37. Officer Michael Smalarz testified that he is currently employed with the City of Chester Police Department and has been so employed for a year-and-a half, prior to which he served as a police officer for the Upper Chichester Police Department for approximately fourteen years. [*Id.* at] 79.

38. In his approximate seventeen years as an officer, Officer Smalarz has conducted gun investigations, effectuated arrests for gun offenses, and has recovered firearms from the waistbands of suspects. [*Id.* at] 80.

39. Officer Smalarz corroborated the testimony of Captain Goldschmidt and Officer Geromichalos. [*Id.*]

40. With regard to his observations of [Appellant], Officer Smalarz testified that [Appellant] was extremely nervous and sweating and kept reaching over to grab the young child's hand. Officer Smalarz could clearly see a bulge in [Appellant's] waistband. [*Id.* at] 85.

41. From his training and experience, the bulge was the imprint of a firearm. [*Id.*]

42, Officer Smalarz assisted [Appellant] in exiting the vehicle and immediately recovered the 9-millimeter firearm from his waistband area. [*Id.* at] 87.

Trial Court Order (TCO), 6/2/22, at 1-5 (brackets added by trial court omitted).

Ultimately, the trial court found "that the testimony provided by all three officers involved was entirely credible." *Id.* at 5. The court concluded that their testimony established that there was reasonable suspicion to stop the vehicle in which Appellant was riding, both because of the information provided by the CI, *id.* at 7, and because "Officer Geromichalos credibly testified that he witnessed the vehicle violate the [M]otor [V]ehicle [C]ode with regard to two different infractions[,]" which provided the officer with "probable cause to stop the vehicle" based on those violations. *Id.* at 7 n.1 (citing *Commonwealth v. Bush*, 166 A.3d 1278, 1283 (Pa. Super. 2017) ("Pennsylvania law makes clear … that a police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is

a minor offense.")). The court further noted that, "[a]s a matter of precaution, a police officer has an absolute right to ask occupants of a vehicle to step from the vehicle during the traffic stop in order to ensure his own safety." *Id.* at 7 (citing *the Interest of M.W.*, 194 A.3d 1094, 1098 (Pa. Super. 2018)). Thus, the court concluded that "Officer Smalarz had the absolute right to ask [Appellant] to step out of the vehicle to ensure his safety and the safety of Captain Goldschmidt, Officer Geromichalos, and the other occupants of the vehicle, especially during a stop where there is reason to believe that an occupant is carrying a firearm." *Id.* Accordingly, the trial court denied Appellant's motion to suppress.

On appeal, Appellant first challenges the legality of the stop of his vehicle. He stresses that, "pursuant to *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019), and *Commonwealth v. Price*, 225 A.3d 1118 (Pa. Super. 2019), mere possession of a firearm is insufficient to establish reasonable suspicion of criminal activity." Appellant at 14. Appellant insists that, here, "the record is clear that the stop was based solely on information provided by a CI" that Appellant possessed a gun. *Id.* at 15. In support, he argues that "Captain Goldschmidt was unequivocal that he ordered other officers to stop the vehicle in which [Appellant] was traveling solely because of the information provided by the CI" and the captain "was at the scene of the stop because he wanted to investigate the gun…." *Id.* at 15-16 (citations to the record omitted). According to Appellant, "[t]he reliance upon motor vehicle

- 9 -

violations as the basis for the officers' conduct is merely a red herring." *Id.*

at 16.

We disagree with Appellant that *Hicks* and/or *Price* supports reversal

in this case. We have summarized that,

> [i]n *Hicks*, police stopped Hicks's vehicle in a gas station parking
> lot based on information that he was in possession of a firearm.
> *Hicks*, 208 A.3d at 922. An officer restrained Hicks's arms and
> removed his handgun from his holster, and a search of the vehicle
> followed. *Id.* Police later determined that Hicks possessed a valid
> license to carry a concealed firearm, and he was not statutorily
> prohibited from possessing a firearm. *Id.* Relevantly, Hicks was
> not charged with firearms offenses. *Id.* The trial court denied
> suppression, reasoning that possession of a concealed weapon
> justifies an investigatory stop to determine whether the individual
> has a license. *Id.* at 922-23.
>
> Ultimately, the Pennsylvania Supreme Court evaluated whether
> carrying a concealed firearm could justify an investigative
> detention. *Id.* at 934; *see also id.* (limiting its analysis to "the
> antecedent justification for a 'stop'" and specifically declining to
> address "whether a police officer who has effectuated a lawful
> investigative detention may treat the suspect's possession of a
> firearm as *per se* authorization to 'frisk' the detainee[]"). The
> Supreme Court first recognized that an individual may legally
> carry a concealed firearm in public if he is licensed to do so. *Id.*
> at 926. The Court further recognized that it is impossible to
> ascertain an individual's licensing status from his appearance. *Id.*
> at 937. Following an extensive review of applicable Fourth
> Amendment jurisprudence, *see id.* at 930-36, the Court
> concluded that there is "no justification for the notion that a police
> officer may infer criminal activity merely from an individual's
> possession of a concealed firearm in public." *Id.* at 936. Thus,
> possession of a concealed firearm "alone is an insufficient basis
> for reasonable suspicion that criminal activity is afoot." *Id.* at
> 945.

*Commonwealth v. Jones*, 266 A.3d 1090, 1093 n.7 (Pa. Super. 2021).

In *Price*,

Officer Klein testified that he received a radio broadcast, based on a 911 call, relaying that a black male wearing a white T-shirt and grey shorts and driving a silver Lexus with a license plate reading "GWL8569," was located on the 5100 block of Willows Avenue and in possession of a firearm. Officer Klein observed Price, whose sex, race, T-shirt color, and vehicle, aside from one digit on the license plate, matched the tip, in the location given by the tip, within a minute of receiving it. The officer then stopped and questioned Price. Rachel Clark approached Officer Klein after the arrest, and told him she had called 911 because she observed Price "put an item in the trunk of the vehicle" and "[load] bullets into a brown bag and [place] that item into the trunk of the vehicle." The Commonwealth presented no other evidence regarding the contents of the 911 call or the radio broadcast.

*Price*, 225 A.3d at 1122 (footnote omitted). Based on these facts, we concluded that,

the police were acting solely upon information that a person matching a certain description was located at a certain place within a high-crime area and was carrying a firearm. There was no evidence that the police had reason to believe that Price was carrying a firearm illegally or was engaged in any other illegal activity. Nor did the police observe Price do anything illegal before stopping him. Although the police were acting according to the law of the time, under *Hicks*, the police lacked reasonable suspicion to stop Price.

*Id.* at 1122-23.

Applying these decisions to the instant facts, the Commonwealth aptly

explains:

[Appellant's] reliance upon *Hicks* and *Price* is misplaced and in contrast to the trial court's specific finding that the stop of the vehicle was not simply based upon the information that [Appellant] was in possession of a firearm, but rather, the [M]otor [V]ehicle [C]ode violations observed by Officer Geromichalos prior to initiating the stop. [Appellant] selectively chooses to ignore the independent basis for the stop because it better suits his argument; however, this strategy provides no basis for relief.

\*\*\*

- 11 -

[Appellant] contends that the facts in *Price* are identical to the facts presented at the suppression hearing and therefore, the trial court's conclusion of law that the [CI's] tip that he was in possession of a firearm was enough to justify the vehicle stop, was in error. [Appellant's] contention that the facts of *Price* and the case at bar are similar is not entirely wrong. Yet, he chooses to ignore the fundamental difference present in the case at bar that was absent in *Price*: the trial court's specific factual finding that Officer Geromichalos' testimony that he observed two [M]otor [V]ehicle [C]ode violations prior to the stop was credible and its legal conclusion that, based upon the violations, an independent basis, apart from the [CI's] tip, existed to stop the vehicle.

An officer is permitted to stop a vehicle if he or she witnesses the driver commit a traffic violation. *Commonwealth v. Rosa*, 734 A.2d 412 (Pa. Super. 1999). "To establish probable cause to stop a motor vehicle, the police officer must be able to articulate specific facts possessed by him at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in some violation of some provision of the Motor Vehicle Code." *Commonwealth v. Wilson*, 237 A.3d 572, 578-79 (Pa. Super. 2020). "Probable cause does not require certainty, but rather exists when criminality is one reasonable inference, not necessarily even the most likely inference." [*Commonwealth v.*] *Shaw*, 246 A.3d 879[,] … 884 (Pa. Super. 2021).

Here, the trial court specifically found Officer Geromichalos' testimony to be credible, in its entirety. Accordingly, although his attention was initially drawn to the vehicle because of the information received from Captain Goldschmidt that [Appellant] was in possession of a firearm, Officer Geromichalos did not initiate the traffic stop until he witnessed the [M]otor [V]ehicle [C]ode infractions. Officer Geromichalos observed [Appellant's] vehicle with unsecured registration. He also observed the vehicle fail to turn-on its turning signal when changing lanes. Officer Geromichalos stated that he would have stopped the car for these traffic infractions regardless of whether information had been provided by the [CI]. The trial court listened to the testimony, observed the witness, and made a specific finding that Officer Geromichalos did observe the infractions, giving him the requisite probable cause to initiate the stop.

[Appellant] baldly discredits any discussion of the [M]otor [V]ehicle [C]ode violations, calling it a "red herring" and stating that the officer's testimony regarding the [M]otor [V]ehicle [C]ode

- 12 -

infractions was "questionable."  Yet the only "red herring" is [Appellant's] decision to rely solely upon only half of the trial court's analysis, ignoring the independent basis for the stop.[4]

> [4] The trial court's conclusion that reasonable suspicion existed based upon the [CI']s tip was merely one part of its overall analysis.  The trial court chose to provide further analysis that, regardless of the information, the stop was lawful based upon the [M]otor [V]ehicle [C]ode violations.  If a trial court's decision is correct, this Court may affirm on any ground.  *See*[] ***Commonwealth v. Bishop***, 829 A.2d 1170 (Pa. Super. 2003).

Commonwealth's Brief at 12-15 (one footnote omitted).

After carefully reviewing the record, we agree with the Commonwealth. Officer Geromichalos's testimony supports the trial court's findings that he observed the vehicle fail to properly use a turn signal, and he noticed that its registration tag was "unsecured."  TCO at 4 (citing N.T. at 61).  The officer stopped the vehicle based on these violations, not solely the tip provided by the CI.  ***Id.*** (citing N.T. at 63).  The trial court found this testimony credible. ***Id.*** at 5.  Accordingly, this case is distinguishable from ***Hicks*** and ***Price***, where the stops were premised **only** on the defendants' possession of a firearm.  Thus, the stop of Appellant's vehicle was lawful.  ***See also Whren v. United States***, 517 U.S. 806 (1996) (pretextual traffic stops do not violate the Fourth Amendment as "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); ***Commonwealth v. Mathis***, 173 A.3d 699, 713 n.12 (Pa. 2017) (indirectly citing ***Whren***; concluding that "[a]lthough Agent Welsh testified that, in addition to safety reasons, he intended that [Mathis] not leave the residence with drugs, … this subjective

- 13 -

alternative basis for the frisk does not invalidate the protective search, since the agent articulated objective, permissible grounds for the intrusion").

Next, Appellant contends that, even if the stop were legal, the officers' seizing and frisking him was not supported by reasonable suspicion and, therefore, warranted suppression of the gun. Again, Appellant analogizes his case to **Hicks** and **Price**, claiming that,

> as in **Price**, and similar to the facts of **Hicks**, the officers seized [Appellant] and then placed him under arrest solely due to information from a CI that he possessed a firearm. There was no indication that he was pointing the weapon at anyone, that he was holding it out in the open, [or] that he was doing anything with the firearm at all. There was also no indication that he did not have a license to carry, nor that he was engaged in any other criminal activity. Captain Goldschmidt had observed [Appellant] on other occasions that same week when the CI also gave information that [Appellant] had a weapon, but the [c]aptain never observed [Appellant] with a weapon on those prior occasions, nor did he observe him engaged in any criminal activity (**see** N.T. … at 37-38).
>
> Apart from the CI's information that [Appellant] was in possession of a firearm, there were no other factors indicative of any criminal activity — including his "nervousness" — that would provide reasonable suspicion to justify a seizure of [Appellant], or probable cause for his arrest.

Appellant's Brief at 25-26.

Again, no relief is due. As the trial court correctly recognized, **see** TCO at 7 ¶ 8, this Court has declared that, "[a]s a matter of precaution, a police officer has an absolute right to ask occupants of a vehicle to step from the vehicle during traffic stop in order to ensure his own safety." **In the Interest of M.W.**, 194 A.3d at 1098. Moreover,

the **Terry** "stop and frisk[]" permits a police officer to briefly detain a citizen for investigatory purposes if the officer "observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot." **Commonwealth v. Fitzpatrick**, … 666 A.2d 323, 325 ([Pa. Super.] 1995); **Terry v. Ohio**, 392 U.S. 1, 30 … (1968).

**Terry** further held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others" the officer may conduct a pat down search "to determine whether the person is in fact carrying a weapon." **Terry**, 392 U.S. at 24…. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." **Adams v. Williams**, 407 U.S. 143, 146 … (1972).

\*\*\*

To conduct a pat down for weapons, a limited search or "frisk" of the suspect, the officer must reasonably believe that his safety or the safety of others is threatened. **Commonwealth v. Arch**, … 654 A.2d 1141, 1144 ([Pa. Super.] 1995).

\*\*\*

The **Terry** totality of the circumstances test applies to traffic stops or roadside encounters in the same way that it applies to typical police encounters. **See Commonwealth v. Mesa**, … 683 A.2d 643, 646 ([Pa. Super.] 1996). Moreover, the principles of **Terry** apply to all occupants of the stopped vehicle, not just the driver. **See id.** (applying the principles of **Terry** to determine whether the police were permitted to conduct a pat down search of the passenger in a vehicle that was stopped pursuant to a motor vehicle violation). Indeed, as we have observed, "roadside encounters, between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." **In re O.J.**, 958 A.2d 561, 564 (Pa. Super. 2008) (*en banc*), **citing Michigan v. Long**, 463 U.S. 1032 … (1983).

**Commonwealth v. Simmons**, 17 A.3d 399, 403 (Pa. Super. 2011).

In this case, Officer Smalarz testified that during the traffic stop, he stood beside the "driver's side rear window" where he could see into the car.

N.T. at 83. From there, he could see Appellant inside, and testified that Appellant "appeared nervous. He appeared sweaty, he kept reaching over and grabbing the baby's hand." *Id.* at 84. As the officer was watching Appellant's hands "to see if [he] observed anything that could be a danger to [himself] or anybody else on the traffic stop[,]" he "observed an imprint and also a bulge in [Appellant's] … front waistband…." *Id.* at 85. Based on the officer's experience, he believed that the imprint in Appellant's waistband was consistent with "[a] possible weapon[,]" more specifically, "a gun." *Id.* at 85, 86. Additionally, Officer Smalarz was aware of the information provided by the CI to Captain Goldschmidt that Appellant had a gun. *Id.* at 86. Accordingly, the officer asked Appellant to step out of the vehicle, and "put his hands on the hood of the car," at which point the officer "did a sweep of his waistband and clenched what [he] felt to be a firearm." *Id.*

We discern no error in the trial court's conclusion that Officer Smalarz acted lawfully by asking Appellant "to step out of the vehicle to ensure his safety and the safety of Captain Goldschmidt, Officer Geromichalos, and the other occupants of the vehicle, especially during a stop where there is reason to believe that an occupant is carrying a firearm." TCO at 7. Given the information provided by the CI that Appellant was armed, coupled with Officer Smalarz's observations of Appellant's nervous behavior and the bulge in his waistband that was consistent with a gun, the officer had reason to believe that Appellant was armed and dangerous, such that the officer's safety — and the safety of the other officers and individuals present at the stop — was

- 16 -

threatened. Thus, the officer was authorized to remove the firearm. *See Interest of T.W.*, 261 A.3d 409, 425 (Pa. 2021) ("[W]e hold [that] a police officer may remove an object from within a suspect's clothing during a *Terry* frisk if the officer has reasonable suspicion that the object is a weapon."). Accordingly, the officer acted lawfully in conducting the *Terry* frisk of Appellant's person, which led to the discovery of Appellant's gun. The trial court properly denied Appellant's motion to suppress that weapon.[1]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/8/2024

_____

[1] Appellant confusingly intermingles arguments that he was illegally detained and frisked without reasonable suspicion, with claims that he was unlawfully arrested without probable cause. However, Appellant admits that he was arrested **after** the gun was recovered. *See* Appellant's Brief at 19 ("[A]s [Appellant] exited the vehicle, [officers] turned him around with his hands on the car, removed the firearm[,] and handcuffed him."); Appellant's Reply Brief at 4 ("[Appellant] was arrested **after** the recovery of the firearm and that arrest was not based on probable cause. At the time of the arrest, no officers had any interaction or communication with [Appellant] about the firearm and did not know whether he had a license to carry. Thus, there was no evidence, let alone probable cause, that he had committed any crime at the time he was arrested.") (Appellant's italicized emphasis omitted; bolded emphasis added). Thus, even if Appellant were correct that his arrest was unlawful, it would not result in suppression of the gun, which was found **before** that arrest and subsequent to a lawful stop and *Terry* frisk, for the reasons set forth *supra*.

- 17 -